Good morning. May it please the Court, my name is Ron Spritzer. I appear on this case on behalf of the United States. One of the appellants will be sharing our time during this argument with Mr. Branson, counsel for the State of Idaho. We'd like to reserve five minutes for rebuttal of the opening 15. I will attempt to limit myself to 10 minutes. May it please the Court, this case concerns the district court's modification of a consent decree that provides for the cleanup of an area known as or referred to as the box, a 21-square-mile area within the Coeur d'Alene River Basin. Do we have a final order? Yes, Your Honor, you do. Has there been an allocation of the $7 million to the different participating parties now? Yes, Your Honor, that's in the excerpt. Is that before us? Excuse me? Is that order before us? The allocation? That was the final action that the district court took. When we start measuring the time for appeal? We filed a second notice of appeal because it was not absolutely clear to us whether the final order would be the district court's. That's what I was asking. But we filed two notices of appeal. We consolidated them. They're both before the court. So it's somewhat unclear which would be the final order. But under any interpretation, this was properly before the court. And HECLA has not disputed that. Excuse me, the appellees have not disputed that in their brief. What the district court did, during the negotiations leading to the consent decree, there was extensive, intense bargaining between the parties over whether the consent decree, in addition to resolving issues within the so-called box, would also limit EPA's authority to take so-called remedial action under the surplus statute, the Superfund statute, in the area outside the box. This was the subject of intense negotiations. The negotiations, it was one of the primary issues during the negotiations. Those negotiations lasted approximately one year. EPA steadfastly refused to accept the demand of the mining companies that it be restricted. And in the consent decree, expressly reserved its rights to take remedial action outside the box. Then, approximately three to four years later, when EPA did begin the process of taking remedial action in the basin, the ‑‑ well, approximately three years after EPA began that process, in 2001, the defendants filed a motion to modify the consent decree to put on EPA essentially the kind of restriction that EPA had consistently refused to give them, that is, to require EPA to give them essentially an offset or reduction in their liability, precisely what EPA had refused to do during the negotiations process. We contend this was an abuse of the district court's discretion. First, let me address the issue of whether the change that took place and the alleged change is EPA's decision to exercise remedial authority in the basin, that is, the area outside the box. Our basic position is that change is anticipated when the parties bargain over it and address it in the decree. That, we submit, upon the district court's own findings, clearly occurred here. In other words, we are not arguing or taking issue with the district court's factual findings. What we say the district court did wrong here is to fail to appreciate that when parties bargain over and discuss an issue of potential concern and address that issue in the decree and resolve the relationship between that event, should it occur, that is sufficient to demonstrate that the issue of the issue. Did any of the companies bargain for bankruptcy? Did they bargain for bankruptcy? No. In the sense that whether their obligations would? The district court made a finding or an observation that by adding on the material recovery outside the box, that each of these corporations were headed for bankruptcy. I don't think he actually said that, Your Honor. But to the extent he might have implied something like that, no, there was no provision in the consent decree, certainly none that I can recall in any event. It's a long consent decree. If I'm in error, I apologize. But I can recall nothing in the consent decree that in any way modifies or limits their obligations in the consent decree. In fact, as we pointed out in our reply brief, there is a perk. It limits the amount of expenditure. And the expenditures went well beyond the initial estimates, right? The expenditures for their work within the box went beyond the estimated level. That's true. But the district court, in the same orders that are under appeal here, and nobody's appealing this, said increased costs were anticipated. So the district court accepted our position on that, that increased costs within the box were anticipated. Let me also point out, if I may, because I think this also addresses Your Honor's question, there is a provision in the consent decree, in the so-called force majeure section of the consent decree, that says financial impact to the defendants will not excuse delay or nonperformance of their obligations. So adverse financial impacts upon the defendants was, in fact, something that was addressed in the decree. They assumed the risk by entering into this decree. They assumed the excuse. They did not assume any risk for any duties outside the box, right? Under the decree. They did not assume any obligations for areas outside the box. They did assume the risk by allowing, by signing a decree that expressly provided that EPA would be able to take action outside the box in its discretion. Did the district court make a finding that there were some pretty consistent recommendations that there, that any activity outside the box would be coordinated with that inside the box? I think what the district court found, Your Honor, is this. The district court, we argued that these were, what EPA had done was describe its current intention to address contamination outside the box through something known as the Coeur d'Alene Basin Restoration Project. We don't dispute, we don't dispute that during the negotiations and, in fact, for a substantial period before the negotiations, EPA so represented to the defendants that that was its plan at the time, that was how it intended to go about addressing contamination in the basin, that it had no intent to change that at the time and so forth. But that does not change the fact that notwithstanding those statements of EPA's present intention, the district court referred to them as assurances or statement of intent, that the defendants continued to appreciate the possibility that EPA's plans could indeed change over the long period that it would take to address this extensive contamination and sought something that would convert EPA's current plans for addressing contamination in the basin into a permanent restriction of EPA's authority. So what we're saying is by bargaining over this issue, by anticipating the possibility that notwithstanding EPA's current plans, those plans could indeed change, they anticipated what eventually happened. What happened here is EPA, not only at the time the consent decree was negotiated, but subsequent, for approximately three years afterwards, continued with the Coeur d'Alene Basin Restoration Project, the plan that the defendants say they understood EPA was going to follow. So they got what EPA told them it was going to do. That is, EPA said this is how we're going to address contamination in the basin. EPA acted consistently with that. But the parties bargained over the separate contingency of what if EPA decides it has to do something different. That's what we say was anticipated. We're not suggesting that at the time the consent decree was issued, either EPA knew or the defendants knew exactly how future events would unfold. That's often the case in consent decrees, as I'm sure the Court can appreciate. What — The district court made a finding that the activities of the EPA increased the degree of financial hazard to the operating companies? Increased the degree of financial hazard. I think what he said basically — I'm not looking at his findings, page 675-86. Right. My recollection is he basically — I think you can describe his finding fairly that way. That is, that they were — that they had difficulty getting credit once EPA made this decision to expand the remedial action, to include areas outside the box, that it became more difficult for them to get credit. You started your argument that we can accept as true all the findings made by the district court, right? On the issue of anticipation, I wasn't getting into the question of whether this issue — whether there was — whether — assuming there was an unanticipated change, it actually made compliance more onerous. On that issue, we did, in our brief, take issue with some of the district court's findings. Particularly, we pointed out that while — and I think Your Honor may be reading from the September 2001 order. There actually were two orders here, because the September — I read both orders last night, so — What happened here was that subsequent to the September 2001 order, we, with the district court's permission, introduced evidence that showed, in fact, that Heckler, the company that alleged that it had this significant difficulty in obtaining credit as a result of EPA's exercise of remedial authority outside the basin, that, in fact, their financial condition very significantly improved. They, in fact, during 2002, according to their own statements, were the leading stock, the stock that performed the best on the New York Stock Exchange. They actually were able to make a 90-plus million — I think it was $92 million stock offering. So the evidence that we introduced showed that — You borrowed $92 million from shareholders, right? It was a new stock offering, so new shareholders, that's right. In other words, they were able to make a — to obtain equity financing. And that was their basic claim here, that because of this action by EPA, we can't get financing. We can't develop new properties. Therefore, over time, we'll get to the point we won't be able to perform our obligations under the decree. What this evidence showed was — There has to be some mining and some productivity and some profit coming from some place to pay for this non-profit-producing activity of cleaning up yards and streets and dumps and whatever else. And the evidence showed that they — And then insulating it and protecting it and putting topsoil on it and doing the whole project, right? Right. That's correct. None of that creates any revenue. That's certainly true. It's all on the expense side. That's true, Your Honor. And it seems to me Judge Lodge has taken some of this into account more than — Well, our problem with his ruling on that — — he's not willing to admit. The problem with his ruling on that issue is he completely ignored the evidence that, in fact, their profits went up, their revenues went up. They said they had the best sales year they'd ever had in their 112-year history in 2002. That's in the record. That was uncontested by them. So, yes, it's fair to say a company needs revenue to be able to meet its obligations under the consent decree. What was not shown here was that these defendants lacked the revenue to continue to meet their obligations. Let me ask you if these circumstances were anticipated, and if we were to determine just hypothetically based on the contract, the consent decree as a contract, that they were anticipated, wouldn't this case still need to go back under RUFO to the district court to see if there's still another option for SARCO under the heavier burden test? At a minimum, I think the court would have to do that. I think, as happened in the Thompson v. Housing and Urban Development case in the Fourth Circuit, the court can look at the facts here. I mean, I think what RUFO is talking about there is a party who's agreed in good faith to a consent decree and has tried its best to meet its obligations and just can't do it. And that's not the case here. So I think the court could find basically they just don't want to do it anymore. That's the problem. That's not ever going to meet the heavy burden standard. Your Honor, my time is up. I'd run over if I might. Are you done with your answer? Yes, Your Honor. I finished my answer. I'm sorry. Thank you. Thank you. Good morning. My name is Kurt Fronson. It's my honor to appear before this court today on behalf of the state of Idaho. And though we have but a very few moments to talk about this case, the state believes it's important to stand with the United States in seeking reversal of the district court's modification of the consent decree. Mr. Spritzer began by talking about the anticipation issue. And for the state of Idaho, the main problem there is that we believe the court misinterpreted what the anticipation standard is. The court appears to believe and appear to apply or understand that anticipation meant what the parties thought likely would occur in the future, not whether the parties considered the issue or not in the future. And we believe it's clear that the case law indicates that where the parties contemplated a future contingent event, when that event occurs, the parties have, in fact, anticipated that event. And it's clear in this case that the parties, both in the actual language of the consent decree anticipated what actually happened later, and also in the so-called extrinsic evidence that what went on during the negotiation, it's clear that the parties clearly anticipated, contemplated, thought about, discussed the possibility that, in fact, EPA would take a different approach in the basin than they were intending to take at the time of the consent decree. We think there's no question about that. Second, does the State of Idaho have any explanation for the mining companies that have gone out of business and terminated the jobs in effect of this project on people that aren't making a contribution to the original contract? There is one company, or actually two related companies, the Coeur d'Alene Mines, that did go into bankruptcy during the implementation of this consent decree. They were very small players, if you will, in the consent decree. And the consent decree itself provided that the obligation for the mining companies that entered into the consent decree was to join several. So that was shifted to the others, right? So that was anticipated. And that was anticipated. Yes. And, of course, there was the force majeure clause, as Mr. Spritzer indicated, which stated that financial inability of the companies to meet their obligations would not be a force majeure. Right. Do you represent the Department of Economic Activity, or are you just here for environmental protection? I represent the State of Idaho here in general. All of its interests? All of its interests, but my main clients, of course, are the natural resource agencies, including the Department of Environmental Quality. That's what I thought. The governor actually did sign this consent decree. I think I have about 25 seconds left. The second error of the Court was in finding that there was an onerous impact on the defendant's compliance with his consent decree. And the problem there is that the case law looks to the actual impacts on the consent decree obligations. In other words, have the obligations increased in some way? Have they become more expensive in some way? Have they changed in some way? Has the contract been coordinated as was represented? At the time the contract was let, as I understand it, the companies were told they would coordinate both the in-the-box and out-of-the-box activities, using the same equipment, scheduling, all of that. Has that all been done? The work under the consent decree has proceeded as provided by the consent decree. There's no question about that. As to the areas outside of the box, outside of this 21-square-mile area, there was an attempt to follow this so-called Coeur d'Alene Basin Restoration Project scenario for a number of years. And once that, apparently the EPA's view, became inadequate, EPA turned to its more traditional administrative and judicial remedies under Superfund or CERPA. So there was, yes, Your Honor, an attempt for a number of years to do that. But ultimately the reason is that the district court modified it. Was it not that there was a change of circumstances? You don't disagree with the facts. The change of circumstances that the court found,  is that the approach to the areas outside of the box did change after three or four years, after the consent decree was signed. But they were supposed to be coordinated with the activities within the box, and they aren't. No, that was never part of the agreement. And it's not reflected in the consent decree. What about the representations made? And that's what the district court found. I'm not familiar with where that representation is. Did you read the findings of that from the district court? Yes, sir, I did. Okay. I need to stop at this point. Thank you. Good morning, Your Honors. My name is Elizabeth Temkin. I am here for Hekla Mining Company. With me at counsel table is Mr. Gary Babbitt, representing SARCO. I will be using the time allotted for our side of this, but to the extent that you have questions that directly relate to SARCO, which Mr. Babbitt is ready to address. I think it's important to put this situation in context and to focus perhaps first on the disagreement between the parties and the court's finding about changed circumstances, because that's the nub of this Rule 60b-5 equitable jurisdiction. And if you don't have changed circumstances unanticipated by the parties, we don't  The circumstance that we claim changed was EPA had promised Hekla, had promised the CEO of Hekla, who's charged with the financial health of the company, that the Superfund site, the box, the little box in this big basin, would not be expanded to include the limited spending, unlimited analysis, and unlimited litigation. And the companies needed that assurance because, as Judge Lodge found, they had limited resources. Let me, you know, it's like reading two parallel universes, to read these briefs and to read the judge's order, to be honest. Because over here we have the companies are asking for a circular release during these whole negotiations, and that's refused. So it seems that, you know, if you take that as read, what you have here is this whole thing was anticipated that something might happen outside the box that would be expensive and catastrophically, from an economic standpoint, to the company. So they talked, there was discussion about what's going to happen outside the box. And it was clear in the language of this consent decree, as I read it, that there were no guarantees for outside the box, that the government reserved all of its rights to do whatever it was going to do, and they refused a circular release. So in the face of that, I'm now trying to balance out what you just told me. So help me out. I will help you out. If you look carefully at what was reserved in the consent decree, paragraph 84A, the covenant not to sue, paragraph 90 and 93, which are the reservations of rights, what the United States reserved was their authority to take response action. We knew they were reserving it. They had to reserve it. They couldn't contract that away. But what the consent decree is absolutely silent on is site expansion, and site expansion is not a response activity. EPA has conceded that. The Eagle Pitcher case on the national priorities listing in the D.C. Section 104 of CERCLA, which has limits on it in the absence of an NPL listing, national priorities list listing, and section 105 that grants the authority to list. EPA did not address one way or another in the consent decree what it was going to do on site listing. But was this discussed? It was. And there were no assurances given. The EPA, the attorneys said, we can't give assurances. So I go back to Mr. Brown and I said, the consent decree isn't going to address this issue. Mr. Brown says, a pox on the lawyers, I'm going to go talk to the top dog at EPA, Region 10 in Seattle, and I'm going to get an assurance, because I need an assurance they're not going to superfund the whole basin. And Mr. Brown came to Seattle. He met with the top dog. And as Judge Lodge found, he got the assurance. The regional administrator could have said, no. I talked to my lawyers. The lawyers told me I can't do this. But Ms. Rasmussen did it. And I think it's important to recognize that that's what the changed circumstances we're complaining about is. But the difficulty is, is he's got a binding contract consent decree where this doesn't exist, which is not ambiguous. Clearly not ambiguous. And so what would be, under the rules of contracts construction, the authority to import the Brown conversation and assurance testimony? First, a consent decree is a contract, but it's more than that. And it is subject, and the parties agreed in the consent decree specifically that it was subject to Rule 60 of the Rules of Civil Procedure. Rule 60 provides for modification of a consent decree in the court's equitable discretion, and this is key, in light of all of the circumstances. That's the Bellevue case. It's the Rufo case. It's every case where a district court is exercising its equitable discretion. It is supposed to look at the totality of the circumstances. The totality of the circumstances in this case was a consent decree. Which says that you release everything, you know, that there is a reservation of right for anything outside of the site. It says. Outside the box, right? It says that there's a reservation of rights to undertake response action and respond to releases outside the box. That's Section 104 authority. It does not say anything about listing. Okay. So let me just understand here. It's a technical argument under CERCLA. It says liability for future disposal, release, or threat of release of waste materials outside the site. It's not Section 105. And you're saying that a 105 listing, which is a separate administrative action to superfund a particular location, is not included in this reservation of right? I am saying that, Your Honor. I'm also saying that the court is allowed to look at the totality of circumstances. The court did in a two-day hearing. There are extensive findings of facts spread across two orders. And the court found that, in fact, in essence, if the companies were going to continue to implement this consent decree, the one at issue here, and address the issues outside the box that are also in front of Judge Lodge, then the companies had to survive. And the companies had limited resources, clearly. And we were talking about something close to limitless liability. And Judge Lodge said, I can't put a number on it exactly. I just know it's big. And, in fact, as the other case has evolved, the numbers are huge. They're even bigger than the numbers in the box. Kennedy, you don't make the bankruptcy argument in light of the joint and several other cases.  and be concerned about the financial liability under the contract. Is that correct? That's correct, Your Honor. The ---- So anything that Judge Lodge has said or didn't respect the bankruptcy or anticipated bankruptcy or the testimony of the parties really has nothing to do with the decision of the case? It does to the extent in his equitable discretion he can look at the totality of circumstances and be concerned about the financial viability of the companies to continue to fund activities in the basin. And he was concerned about financial viability. He was concerned ---- The reason I wonder about Judge Lodge, I know historically he was a district court trial court judge in the State of Idaho that was very well respected. Yes. But he then became ---- he got an appointment as a bankruptcy judge and served in that capacity for a period of time prior to serving on the district court. Yes. And his orientation is very much in terms of financial solvency of parties, companies, and corporations. And he's familiar with the mining district. Is that right? I think all of that is correct, Your Honor. And I think that what he sees is these old mining companies, the last survivors ---- you know, this is the penalty of survival is here you are 100 years later and these two companies are stuck with this legacy that at one time was considered a good thing, is now considered a bad thing. And they're in a position of trying to find a way to generate funds over time. These companies have stepped up. The companies are looking, everyone's looking for ways to generate funds over time to deal with the issues, the real issues associated with Coeur d'Alene Basin cleanup. And I think Judge Lodge sees himself in a position where that's what ---- how do I manage all of this to keep these companies going, generating cash, and get done what needs to be done in the basin? Now, there are disputes about what needs to be done. Are these the principal industries that support the economic base of the community? Historically, yes. Currently, it's in flux like much of the west, from a resource extraction focus to more of a tourism recreational focus. And the Coeur d'Alene Basin, unfortunately, is sort of caught in the middle of that with no real strong base in either camp at this point. In this case, we're not talking about a mere contract between the government and your clients. We're talking about a consent decree. Now, is there anything in the record to indicate ---- you're claiming that you were misled by the government into signing this consent decree. Correct. Now, is there anything in the record to indicate that the judge was misled when he See, it's his decision that you're trying to seek to avoid. Now, was he ever misled by anything? He took the contract on its fall, up and down, up and down. And the contract says that nothing in this contract precludes the government from going after you for your spoiling the environment outside the box. And the fact is that you did spoil the environment outside the box. Now, where in the world was the judge who signed that judgment misled? The ---- respectfully, I don't think it's a question of being misled at the time the consent decree was entered. That was 1994. Well, a judge looks at a decree, and he looks at the four ---- all of the words of the decree. Correct. And he says, this is fair. And part of the fairness was the government says, we're not bound by the box. We can go outside the box. And your client says, we understand that. Now you're coming in and saying that you were misled or the judge was misled. What we are claiming ---- Do we have judicial decrees that nebulous that can be overturned any time anybody expresses a desire that they ---- that it's too hard on them? The judge specifically rejected the argument that compliance had become too costly. We made that argument initially. And the judge said, no, I'm not buying that one. But we did have a right under the consent decree to seek modification for changed circumstances. The circumstances did change. EPA had promised us, congressmen, the world, that it was not going to superfund the whole basin. And it broke that promise. It changed its mind. And it can change its mind, but there should be consequences if there are impacts from their changing their mind. And that's what Rule 60b-5 is all about, particularly in the context of something like this, where you're talking decades of implementation. Things are going to change. And the court has to have the flexibility to respond. In all big decisions, and there's probably no bigger decision than cleaning up the environment, things have to be done incrementally. Because you cannot look at the environment and say we're going to clean it all up at one time. It has to be done this way and that way and this way and that way. And each time, you learn something by each step. Correct. Now, that's what this case is all about. It is what this case is all about. But the United States said we're not going to use superfund. They had learned. They had learned from those early increments. We're not going to do it under superfund. They didn't say that in the contract. No. But the judge. That's what we're talking about. What did the judge know? No. The judge Lodge looks at the contract, but he also, under Rule 60, looks at the totality of the circumstances. He's allowed to do that. The United States agreed in the consent decree that he could do that. And he looked at the totality of the circumstances. He made his factual findings. And he said this isn't right. And the United States could have negotiated a consent decree that didn't include a reference to Rule 60, that didn't allow modification. But they included it. We invoked it. The Court found what it did. And its decision is supposed to be reviewed at this point for abuse of discretion. The Court agreed with our rendition of the facts, didn't agree with the United States. And this Court is not supposed to substitute its view for the district court if the findings are supported, and there is support in the record for the findings. This project could have been a superfund project in its entirety from the onset, could it not? And the government elected to cut it up into bits and pieces. In theory, yes. Right. And in terms of the box, they then got consent to accomplish certain objectives at a partial cleanup, right? Correct. Okay. And what I go back to, and I think this is really important, is that the regional administrator did not have to provide the assurances she did. And all this case really stands for, ultimately, as a substantive matter, is that EPA shouldn't make promises if it doesn't intend to keep them. It does not affect the covenants and the reservations under the consent decree. We haven't challenged those. We said EPA, we know EPA reserved its authority to take response action outside the box. It had to under the Coeur d'Alene Basin Restoration Project. And just as a matter of policy, it couldn't give that right away. It's in charge of public health and the environment. So, but to then go and make that promise and then very soon thereafter undo it, that's the changed circumstance that Judge Lodge saw as being fundamentally unfair, onerous. You interpret an expectation to being a promise. Judge Lodge found. There's no question about it, that there was an expectation that at the time the consent decree was signed, that there was no problem outside the box. That was merely an expectation and not a promise. Judge Lodge found it to be an assurance and that the companies reasonably relied on it. What were the words of the promise? Excuse me? What were the words, actual words of the promise? One of the letters to, I think it's Congressman LaRocco, said that EPA had no intention to superfund the entire basin. That's exactly what I said. That was their intention. That's not a promise. Judge Lodge, who I'm going to refer to, found it to be an assurance to the companies that they reasonably relied upon that EPA would not superfund the entire basin. Contrary to the words of the consent decree itself. I would respectfully submit for the reasons I mentioned earlier in the distinction between section 105 and section 104, that it is not contrary to the words of the consent decree. Did your client pollute the environment outside the box? Excuse me? Did your client pollute the environment outside the box? My client, like a lot of historic mining companies, did release tailings into the Coeur d'Alene River, yes. They did? Yes, they did. And it was authorized at the time they did it. The final thing I think I should touch on is this new evidence that was kind of dropped in the record right before the judge's decision. And this is the financial statement and a few other pieces of financial information. That information came into the record on an affidavit of an attorney. It wasn't put in context. It didn't address whether or not the company still had limited resources. Yes, Heckler had been the best performer on the New York Stock Exchange. That's because its stock had been somewhere around 63 cents a share. And it's not hard on a percentage basis to become the best performer when your stock is that low and actually being threatened to be delisted from the New York Stock Exchange. So without the context, without any expert testimony, that evidence really doesn't have any meaning or relevance. Thank you. Thank you. I'd like to have you address her point that she reads this Section 90 releases as somehow distinguishing between release in the release or reservation and a listing under CERCLA. Absolutely incorrect, Your Honor. Let me explain what is going on here. See what I mean? We're in parallel universes here. The problem, what they're telling you, in order to do remedial action outside the box, the NPL facility, the site, has to include areas outside the box. In other words, EPA, in order to spend Superfund money on a remedial action outside the box, that means the site has to include the areas outside the box. Anybody with any reasonable objectivity, and these are sophisticated businessmen assisted by lawyers, will understand that if EPA is reserving the right to take remedial action outside the box, it's reserving the authority to take actions that are essential in order to be able to take that action. And so they're trying to make a dichotomy. They're trying to posit a dichotomy that is just unreasonable in light of the regulations. So then they say, well, maybe it was possible that that would happen, but we have to defer to Judge Lodge's factual finding that this letter to the congressman was an expectation, promise, representation, contract, I don't know, whatever. It's a finding. They use the word promise. There was no finding by the district court that there was a contract. He clearly, that in any way, restrained or limited EPA's ability to expand the site. All he's, what he specifically said in his ruling, EPA had the authority under this consent decree to do what it did. That meant EPA had the authority to take remedial action outside the box, including,  if EPA has the authority to take remedial action outside the box, it has the authority to take any necessary steps to bring that about. That's just a common sense. But then they're saying, well, they might have authority, but the fact of the matter is there is this side expectation. So we sign this thing recognizing that authority, but we also have fairly direct representation by EPA. It was certainly true to say that at the time EPA did not intend to expand the site. They told the congressman, as the other member of the panel indicated, it was a statement of intent. The law distinguishes between statements of intent and promises. They are not the same thing. That is the confusion that permeates their entire argument. A statement by EPA, a statement by EPA was entirely accurate at the time. They told the companies the truth. We do not intend to superfund the box as of the date of this letter, which I think is sometime in 1992. Did they intend to coordinate the activity within and with outside the box in any respect? Excuse me, Your Honor. Are these totally independent games that EPA is playing, or is there an interdependence between the two in any respect? Interdependence between? In the box and outside the box.  Can you use it outside the box? Or is there a line that says you can't take the steam shovel into the next lot to dig it up? I'm not aware of any, Your Honor. So there is an interdependence between the two projects. Is that right? I'm not exactly sure what Your Honor means. I think the best way I can answer that is. Isn't that this Coeur d'Alene Basin reclamation project? Restoration project. Restoration project. Which always, by the way, left open the option of releases. The right of remedial action outside the box. It wasn't to be taken directly under the Coeur d'Alene Basin restoration project, but in the framework document that's in the excerpts of record, they still recognize the possibility we might have to take remedial action. The point is EPA was never excluding anything. When it was pressed to exclude remedial action outside the box, it clearly reserved that right. And that necessarily includes the right to take whatever actions are necessary to bring that about, to make that impossible. I submit it's totally unreasonable to suggest that a person that sophisticated lawyers and sophisticated businessmen would not understand that if EPA is taking reserving the right to take a remedial action outside the box, it's not reserving the right to do what it did. And I also refer the Court respectfully to page 641 of the excerpts of record, where Heckler is raising this issue and expressing his concern. Well, it's somewhere in this specific letter. I can't. I maybe have the wrong page. But in this letter. Your time has expired, and we thank you for your argument. Thank you. The case of United States v. Esarco is submitted.
judges: Ferguson, Beezer, McKeown